IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ELIZABETH KNOTT,

   Plaintiff,

vs.           No.  03cv1179  DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

   Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's (Knott's) Motion to Reverse and Remand For a Rehearing **[Doc. No. 10]**, filed February 12, 2004, and fully briefed on April 13, 2004.  On February 19, 2003, the Commissioner of Social Security issued a final decision denying Knott's claim for disability insurance benefits and supplemental security income benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to remand for a rehearing is well taken and will be GRANTED.

## I.  Factual and Procedural Background

Knott, now forty-two years old, filed her application for disability insurance benefits on May 17, 2001 (Tr. 52) and her application for supplemental security income benefits on May 29, 2001 (Tr. 261), alleging disability since January 15, 2000, due to memory problems, headaches, back pain, and loss of bladder control.  Tr. 61.  Knott has a tenth grade education and past relevant work as an assembler in a factory, a hospital housekeeper, a motel maid, and a spray

painter.  Tr. 293.  On November 20, 2002, the Commissioner's Administrative Law Judge (ALJ)

held a hearing.  Tr. 271-298.  On February 19, 2003, the ALJ issued his unfavorable decision,

finding Knott's chronic left hip pain and adjustment disorder were severe impairments  but not

severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P,

Regulations No. 4.  Tr. 21.  The ALJ further found Knott retained the residual functional capacity

(RFC) to perform a limited range of light work and was limited to simple, non-public, non-

demanding work requiring only one or two step tasks.  Tr. 22.  The ALJ further found Knott was

capable of performing all of her past relevant work.  Knott filed a Request for Review of the

decision by the Appeals Council.[1]  On August 16, 2003, the Appeals Council denied Knott's

request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final

decision of the Commissioner for judicial review purposes.  Knott seeks judicial review of the

Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

---

[1] Knott submitted additional evidence to the Appeals Council.  Tr. 8-14.  Knott submitted
an MRI report dated March 1, 2003, and progress notes from Mental Health Resources, Inc.,
dated January 14, 2003 to March 11, 2003.  Although this evidence was not before the ALJ,
because it was before the Appeals Council, the Court must consider it when evaluating the
Commissioner's decision for substantial evidence.  *See, O'Dell v. Shalala*, 44 F.3d 855, 859 (10th
Cir. 1994)(new evidence becomes part of the administrative record to be considered by the Court
when evaluating the Commissioner's decision for substantial evidence).

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Knott contends the ALJ's finding that she retained the RFC to return to her past relevant work as a hospital housekeeper, motel maid, and spray painter is not supported by substantial evidence and is contrary to law.[2]  In support of this contention, Knott makes the following arguments: (1) the ALJ failed to ask the vocational expert (VE) to explain the conflict between her testimony and the occupational information contained in the Department of Labor's Dictionary of Occupational Titles (DOT); (2) the ALJ failed to include in his hypothetical question to the VE that she cannot perform prolonged standing and walking; (3) the ALJ failed to give a reason for rejecting Dr. Trance's opinion that she could not perform prolonged standing and walking; (4) the ALJ did not consider the impact of her mental impairment on her ability to function; (5) the ALJ failed to consider that her mental impairment may aggravate her perception of pain and renders his findings suspect; (6) the ALJ did not assess

---

[2] Counsel's brief was difficult to follow and contains several disjointed arguments.

the impact of her mental impairment on her ability to function full-time in the workplace; and (7) the ALJ failed to address the treating counselor's comments regarding her inability to work and the low GAF score the counselor assigned to her.

## A.  Medical and Psychiatric Records From May 2001 through March 2003

On May 6, 2001, Knott presented at Presbyterian Healthcare Services Emergency room with complaints of lower back pain and left hip pain for one month.  Tr. 103-104.  The attending physician ordered x-rays of the lumbar spine and prescribed Motrin 800 mg three times a day.  Tr. 103.  The physician also referred Knott to Linda Adams, a social worker.  The x-rays indicated "minimal changes of the lumbosacral spine and left hip without fracture or dislocation."  Tr. 105 (emphasis added).

On May 29, 2001, a mental health clinician with Mental Health Resources, Inc. evaluated Knott.  Tr. 169-173.  The clinician noted the presenting problem as "not sure" and the expressed need as "needs someone to talk to."  Tr. 169.  Knott reported symptoms of anhedonia (absence of pleasure), sleep disturbance, suicidal ideation, and decreased energy.  Tr. 170.  The clinician listed "possible separation from spouse as an "adjustment related stressor."  *Id.*  Knott also reported excessive anxiety and worry, frustration, mood lability, learning difficulties, low self-esteem, and dissociative states.  *Id.*  The clinician rated her psychiatric and interpersonal domains as severe. At that time, Knott reported she was not taking any medications except diet pills.

On July 10, 2001, the clinician noted Knott appeared disheveled, her posture was slumped, her facial expression suggested anxiety and depression, her body movements were slow, her speech was slow and loud, her style of interaction was controlling and guarded, her affect/mood was hostile, anxious, sad, and fearful, her communication was rational but stilted, she

5

was oriented in all four spheres (time, place, person, situation), her remote memory was impaired,

her abstract thinking and ability to calculate were impaired, her insight was limited, her judgment

was impaired, and her thought processes were coherent and rigid.  Tr. 166, 171.  The clinician

diagnosed Knott as suffering from Major Depressive Disorder, Single Episode, Moderate and

assigned her a GAF[3] score of 50.   A GAF score of 50 indicates serious symptoms (e.g., suicidal

ideation) or any serious impairment in social, occupational, or school functioning (e.g., no friends,

unable to keep a job).  DSM-IV-TR at 34.  The clinician noted the need for medication to reduce

Knott's symptoms and the need for Knott to be compliant and take her medications as prescribed.

*Id.*  The clinician opined Knott "was not capable of not (sic) holding a job at present time, she is

too depressed to work."  Tr. 167.  The clinician recommended Knott have a medical evaluation

with a psychiatrist for medication management.  The clinician opined Knott's prognosis was fair,

but Knott would require long-term therapy, possible indefinitely.  *Id.*

On July 31, 2001,  Dr. Ignacio Gonzalo Martinez, a psychiatrist, evaluated Knott.  Tr.

159-160.  Dr. Martinez completed a Psychiatric Symptom Assessment scale and found Knott

suffered from <u>severe</u> anxiety, <u>moderately severe</u> tension and social withdrawal, <u>moderate</u>

depressive mood, somatic concerns, and hostility, <u>mild</u> loss of functioning, distractibility, motor

hyperactivity, suspiciousness, guilt feelings, helplessness/hopelessness, and <u>very mild</u>

uncooperativeness.  Tr. 159 (emphasis added).  Knott reported that "about three times a week she

---

[3] Global Assessment of Functioning (GAF score) is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning."   American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th ed. 2000) (DSM-IV-TR).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death.).  DSM-IV-TR at 34.

doesn't want to sleep at night for fear her present husband, her father-in-law or her first husband

will kill her in her sleep." Tr. 160. Dr. Martinez diagnosed Knott with Posttraumatic Stress

Disorder (PTSD), Rule Out Bipolar Disorder NOS (not otherwise specified), Adjustment

Disorder with Anxiety, and Nicotine Dependence.

On August 15, 2001, Knott returned to see Dr. Martinez. Tr. 158. Knott reported feeling

very anxious and complained of insomnia, poor concentration, lack of pleasure, fatigue, and

feeling worthless and guilty. Dr. Martinez assessed Knott as suffering from Adjustment Disorder

with Anxious and Depressed Mood. Dr. Martinez prescribed Serzone (antidepressant) and

Risperdal (antipsychotic medication). Dr. Martinez instructed Knott to return in two to six

weeks.

On August 28, 2001, Knott returned to see Dr. Martinez. Tr. 157. Knott continued to

have symptoms of depression. Dr. Martinez increased the Serzone to 150 mg three times a day.

Dr. Martinez noted Knott's affect was more appropriate, and she was oriented in all spheres.

On September 8, 2001, Mario Trance, M.D., evaluated Knott at the agency's request. Tr.

109-117. Dr. Trance noted Knott's chief complaints as (1) back pain and hip pain; (2) PTSD with

depression; and (3) stress incontinence and constipation. Tr. 109. Knott reported having back

and hip pain since 1986. Knott claimed she had been abused by her former spouse. Knott

reported she occasionally had tingling of her feet, toes and ankles; these symptoms occurred more

on the left extremity. As to her PTSD, Knott claimed she experienced flashbacks of the physical

assaults and the abuse she sustained. Knott denied having suicidal ideation but had once

attempted suicide in the past. Finally, Knott complained of chronic constipation and urinary

incontinence with coughing.

Knott reported she could attend to her home "chores" but claimed she had to rest in between chores in order to complete them.  Tr. 110.  At this time, Knott was on Serzone (anti-depressant) 150 mg three times a day, 12:00 p.m., 5:00 p.m. and at bedtime.  Dr. Trance performed a physical examination and noted Knott had no difficulty walking or getting on the examination table.  However, Dr. Trance noted Knott had difficulty lying down because of pain over her lift hip.  Dr. Trance also noted Knott smoked 2-3 packs of cigarettes per day, was under 5 feet four inches yet weighed 194 pounds, and did not abuse alcohol or drugs.

Dr. Trance performed a range of motion evaluation and noted some limitations.  Tr. 112. Dr. Trance found negative straight leg raising, tenderness on palpation over the left hip with no spasm, motor strength of 5/5 in all extremities, no difficulty heel or toe walking, slight difficulty in squatting due to left hip pain, no sensory loss, unremarkable deep tendon reflexes, and intact cranial nerve findings.  Dr. Trance diagnosed Knott with (1) chronic hip pain; (2) PTSD; (3) history of domestic abuse and physical abuse; (4) urinary incontinence; (5) and constipation.  Dr. Trance's Functional Assessment and Medical Source Statement states as follows:

> The claimant is a 40- year-old white female with multiple medical problems who came for this consultation.  Based on the history and physical examination, I do expect some limitation on lifting and carrying.  This is supported by the fact that the claimant has decreased range of motion on the dorsolumbar flexion, however, the claimant has good motor strength on both lower extremities.  Her decreased range of motion can also be limited by her obesity.  Prolonged standing and walking may also be limited.  This due to the fact that the claimant has chronic left hip pain.  Moreover, the claimant has a decreased range of motion over the left hip, such as abduction and adduction, which may affect her chores, like walking.  There are no hand held assistive devices needed for the claimant.  I would also expect limitations in prolonged sitting.  Prolonged sitting may exacerbate the left hip pain.  Physical examination shows tenderness on palpation over the left hip with decreased range of motion of the left hip.  However, I do not expect limitations in overhead reaching, handling of objects, and fine manipulation with hands and fingers. The claimant may need radiologic evaluation or x-ray of the LS-spine together with the hip to determine the etiology of the hip, which may further explain her symptoms.  She needs a gynecological/urologic evaluation regarding her urinary incontinence, most likely stress in origin, most likely stress incontinence.  Her frequency of urinary may interrupt her regular

working chores.  She claims to have constipation for which she moves her bowels once or twice a month.  I tend to question the veracity of this claim.  Physical examination shows no evidence of impaction or any fecaloma.  X-ray may prove or disproved this constipation.  Psychiatric illness may be improved with a combination of medication and aggressive psychotherapy.

Tr. 112-113.  Dr. Trance also completed a Medical Source Statement of Ability To Do Work-Related Activities.  Tr. 114.  Dr. Trance found Knott was (1) limited in her ability to lift and carry, noting she could lift 50 pounds occasionally and 20 pounds frequently; (2) limited in her ability to stand and/or walk, noting **she could stand or walk up to 6 hours in an 8-hour workday**; and (3) limited in her ability to sit, noting **she could sit up to 2 hours in an 8-hour workday**.  Tr. 114-115.  Dr. Trance, however, found no limitations in Knott's ability to reach overhead, to handle objects, to speak, to hear, and to travel.  Tr. 115.  Dr. Trance further found that Knott's ability for fine manipulation with her hands and fingers was unaffected.  *Id.*  Finally, Dr. Trance recommended Knott have x-rays of the lumbar spine.  Dr. Trance completed a range of motion form and noted Knott had decreased abduction and adduction of the hips, and decreased flexion of the spine.  Tr. 117.

On September 26, 2001, Knott returned for her follow-up with Dr. Martinez.  Tr. 157.  Knott reported she forgot to take her Serazone and "was lucky if she took it once a day."  *Id.*  Dr. Martinez noted Knott's mood was depressive and her affect restricted.  Dr. Martinez changed the Serzone to 150 mg, two tablets at 3:00 p.m.  Dr. Martinez instructed Knott to return in one month.

On October 10, 2001, the Mental Health Resources, Inc. treatment team, comprised of Dr. Martinez and Susan Harris, L.M.H.C., completed a Quarterly Treatment Plan Update.  Tr. 155-156.  Ms. Harris noted Knott's psychiatric and activities of daily living had improved.

9

However, Knott continued to exhibit the symptoms of Major Depression and PTSD.  The team noted Knott was impaired in her ability to obtain or maintain a job.  Knott's "Anticipated Discharge Date" was October 9, 2002.  Tr. 156.  This discharge date was contingent on Knott responding well to treatment, otherwise, Knott would need indefinite treatment due to her "severe impairments."  *Id.*

On November 15, 2001, Knott returned to see Dr. Martinez.  Tr. 154.  Knott reported "hating to take Serzone, so she stopped two weeks ago."  *Id.*  Dr. Martinez noted Knott's mood was good, her affect lively, and she was oriented in all spheres.  Dr. Martinez prescribed Librium 25 mg at bedtime and instructed Knott to return in four to six weeks.

On December 7, 2001, Knott went to the emergency room at Presbyterian Healthcare Services with complaints of back pain.  Tr. 119.  Knott described the pain as chronic, dull, radiating, similar to prior back pain and mild.  *Id.*  (emphasis added).  Myrlen Chesnut, an osteopath, examined Knott and noted on the physical examination form that the physical examination of the back was normal.  Tr. 120.  Dr. Chestnut ordered x-rays of the spine and chest.  The x-rays indicated (1) a compaction deformity at T11-T12 and (2) a normal lumbosacral spine.  Tr. 125, 256.  The T11-T12 deformity had been apparent on the May 6, 2001 x-ray.  *Id.*  Dr. Chestnut diagnosed Knott with chronic low back pain and degenerative disc disease.  Tr. 120.

On January 2, 2002, Ms. Harris and Dr. Martinez completed another Quarterly Treatment Plan Update.  Tr. 152.  The team noted Knott continued to experience symptoms of Major Depression, i.e., sleep disturbance, depressive mood, low self-esteem, feelings of worthlessness/hopelessness, suicidal ideation.  The team opined these symptoms impaired Knott's

ability to work or to form friendships.  Ms. Harris opined Knott's prognosis was fair but required

indefinite individual counseling and medication management.  Tr. 153.

On January 10, 2002, Raiman K. Johnson, a psychologist, evaluated Knott at the request

of the agency.  Tr. 126-128.  Dr. Johnson completed a Mental Status Examination (MSE) and

noted Knott was appropriately dressed but her hygiene was marginal and her grooming poor.  Tr.

126.  Dr. Johnson found Knott oriented to person, place, and time.  Dr. Johnson opined Knott

appeared depressed and noted her affect was tearful.  However, Dr. Johnson found Knott

cooperative, of average to low average intelligence, willing to self-disclose, had maintained

adequate eye contact, demonstrated marginal psychological sophistication, had acceptable social

skills, thought processes were slow but intact, did not demonstrate looseness of associations, her

fund of information was adequate, and her executive functions were slow but intact.  Tr. 126-127.

Dr. Johnson found Knott did not demonstrate any symptoms suggestive of an overt psychoses or

neuroses and found her judgment and insight somewhat limited.  Tr. 127.  However, Dr. Johnson

found Knott capable of understanding abstract concepts and demonstrated a limited ability to

engage in deductive reasoning.  *Id.*  Knott denied having experienced any delusions, illusions,

hallucinations or other perceptual disturbances in the past.  Dr. Johnson's impressions and

recommendations were as follow:

> Based upon results of the MSE, it appears Ms. Knott is an individual who is experiencing
> difficulties related to what may be a herniated disk.  As there was no medical
> documentation to confirm her self-report, further assessment may be required.  Based upon
> her self-report concerning the fact she had been in abusive relationships in the past and the
> diagnoses contained in the clinical assessment provided for my review, it appears Ms.
> Knott also is experiencing psychological difficulties which are aggravated by her physical
> deficits.  It was also my opinion Ms. Knott did demonstrate the ability to handle her own
> financial affairs in the event she is approved for SSI benefit payments.

Tr. 127.  Dr. Johnson assigned Knott a GAF score of 55 and, based on her prior history, diagnosed her with Major Depressive Disorder and Posttraumatic Stress Disorder.

On January 16, 2002, Dr. Leroy Gabaldon, a psychologist and nonexamining agency consultant, completed a Psychiatric Review Technique (PRT) form.  Tr. 129-142.  Dr. Gabaldon evaluated Knott for Affective Disorders and Anxiety-Related Disorders.  Tr. 129.  Dr. Gabaldon reviewed the record and found Knott suffered from Major Depression and Anxiety (evidenced by recurrent and intrusive recollections of a traumatic experience).  Tr. 132 & 134.  However, under the B criteria, Dr. Gabaldon found Knott was mildly limited in her activities of daily living, mildly limited in maintaining social functioning, and mildly limited in maintaining concentration, persistence or pace.  T139.  Dr. Gabaldon noted Knott had a history of depression and anxiety but her daily activities were intact, there was no evidence of a thought disorder, and there was no current substance abuse.  Tr. 141.  Dr. Gabaldon noted Knott's diagnosis as Depression and PTSD.  *Id.*

On January 14, 2002, Dr. Chestnut admitted Knott to the hospital for pain control and physical therapy.  Tr. 146.  Dr. Chestnut noted Mental Health had referred Knott.  Dr. Chestnut had seen Knott in the emergency room earlier in the day.  Dr. Chestnut's examination revealed pain with attempted flexion and extension, as well as side bending.  *Id.*  Knott had x-rays of the lumbar spine indicating a 10 % compression fracture of T12 and some degenerative changes in that area.  Tr. 257.  However, "No other abnormalities [were] seen in the lumbar spine."  *Id.*

On January 17, 2002, David Green, M.D., a nonexamining agency consultant, completed a Physical Residual Functional Capacity Assessment form.  Tr. 199-207.  Dr. Green opined Knott could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an

8-hour workday, sit about 6 hours in an 8-hour workday, and the ability to push and/or pull was unlimited.  Tr. 200.  Dr. Green relied on Dr. Trance's evaluation (Tr. 200) and her visits to the clinic (Tr. 201).  On May 22, 2002, Dr. Michael Finnegan reviewed Dr. Green's RFC assessment and concurred with Dr. Green's findings.  Tr. 207.

On January 24, 2002, Dr. Chestnut evaluated Knott for complaints of back pain.  Tr. 145. Knott reported she felt like she was getting along relatively well and was controlling her pain with Flexeril (muscle relaxant), acetaminophen and heat.  Dr. Chestnut noted that Knott "actually gets up and down out of a chair quite well."  *Id.*  Dr. Chestnut also noted his physical examination revealed Knott guarded "a little bit in her T-spine region."  *Id.*  Dr. Chestnut previously had referred Knott to the New Mexico Spine Institute.  Knott reported she had not contacted the institute because she could not make the long distance call.  Dr. Chestnut advised Knott his office would call the institute and make the appointment for her in March.   Dr. Chestnut assessed Knott with fracture of T10 and T12 and refilled her prescription for Flexeril.

On February 28, 2002, Dr. Martinez met with Knott.  Tr. 151.  Dr. Martinez noted Knott was very angry but unable to make life decisions to improve her situation.  Knott reported her husband continued to be abusive.  Dr. Martinez noted Knott was hostile, her mood was angry, her affect was explosive, and she was oriented in all spheres.  Dr. Martinez directed Knott to continue taking the Libruim and return in four to six weeks.

On March 5, 2002, Knott returned to see Dr. Chestnut.  Tr. 144, 254.  Knott complained of severe back pain.  Dr. Chestnut noted Knott's previous x-rays had revealed a fracture of T10 and T12.  Significantly, Dr. Chestnut noted, "It's difficult for me to tell if the patient  is really having pain or if she is seeking medications."  *Id.*  The physical examination revealed tenderness

13

of the lower back.  Dr. Chestnut opined the type of fracture Knott sustained did not result in pain

that lasted very long.  Dr. Chestnut assessed Knott with "proclaimed back pain, etiology not

completely clear."  *Id.*

On March 28, 2002, Knott returned to see Dr. Martinez.  Tr. 150.  Knott complained of

irritability, poor concentration, and motor tension.  Dr. Martinez described Knott as cheerful, her

mood as good, her affect as lively and noted she was oriented in all spheres.  Dr. Martinez

instructed Knott to continue the Libruim and return in two months.

On April 5, 2002, the treatment team noted, "At this time we have agreed to close client's

case management services due to client not engaging with CM."  Tr. 149.

On May 18, 2002, Jill Blacharsh, M.D., completed a Mental Residual Functional

Assessment form.  Tr. 173-176.  Dr. Blacharsh assessed Knott and opined Knott was moderately

limited in the following areas: (1) in her ability to understand and remember detailed instructions;

(2) in her ability to carry out detailed instructions; (3) in her ability to maintain attention and

concentration for extended periods; (4) in her ability to perform activities within a schedule,

maintain regular attendance, and be punctual within customary tolerances; (5) in her ability to

work in coordination with or proximity to others without being distracted by them; (6) in her

ability to make simple work-related decisions; (7) in her ability to complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods; (8) in her ability to

interact appropriately with the general public; (9) in her ability to accept instruction and respond

appropriately to criticism from supervisors; (10) in her ability to get along with coworkers or

peers without distracting them or exhibiting behavioral extremes; (11) in her ability to respond

14

appropriately to changes in the work setting; (12) in her ability to travel in unfamiliar places or use

public transportation; and (13) in her ability to set realistic goals or make plans independently of

others.  Tr. 173-174.  Dr. Blacharsh summarized the evidence and opined:

> In sum, 40 year old woman with MDI's of adjustment disorder and PTSD who has severe
> limitations that do not meet or equal any of the listings.  Should be able to do simple
> repetitive 1-2 step tasks with adequate pace and persistence; may do better with limited
> social contact.  Referral to DVR may be helpful.

Tr. 175.  On the same day, Dr. Blacharsh completed a Psychiatric Review Technique form.  Tr.

177-190.  Dr. Blacharsh found Knott was moderately limited in her activities of daily living,

moderately limited in maintaining social functioning, and moderately limited in maintaining

concentration, persistence or pace.  Tr. 187.  Dr. Barash also found the evidence did not establish

the presence of "C" criteria for Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related

Disorders).  Tr. 188.

On May 28, 2002, Knott returned to see Dr. Chestnut.  Tr. 255.  Knott complained of

back pain and reported she could not afford to go to the New Mexico Spine Institute.  She had

also not made contact with the University of New Mexico pain clinic.  Dr. Chestnut noted, "[t]he

patient claims that she continues to have a lot of back pain but also pain into her legs with what

sounds like electric type of pain."  *Id.*  Dr. Chestnut diagnosed Knott with (1) fracture T12 and

T10, moderately old; (2) sciatica; and (3) urinary incontinence.  Dr. Chestnut encouraged Knott

to contact the University of New Mexico pain clinic and prescribed Arthrotec 75 mg twice a day

and Vicodin one tablet three times a day.  Dr. Chestnut gave Knott samples of Ditrpan XL 10mg

for her urinary incontinence.

On June 6, 2002, Knott returned to see Dr. Martinez.  Tr. 222.  Knott complained her

back, hips and leg pain made her grouchy and bitter.  Dr. Martinez described Knott as "a more

friendly 39 year old female, mood disgusted, affect restricted and irritable, oriented OK."  *Id*.  Dr. Martinez advised Knott to continue taking Librium and added Prozac 20 mg.  Dr. Martinez directed Knott to return in two months.

On July 10, 2002, Knott returned to see Dr. Martinez.  Tr. 221.  Knott reported she had stopped taking Prozac and Librium "a few weeks ago."  *Id.*  Knott reported she had stopped taking her medication because she started hearing voices and seeing moving objects.  However, Knott reported the voices still bothered her, and she was still having problems sleeping.  Dr. Martinez described Knott as hostile, mood depressed, and affect explosive.  Dr. Martinez diagnosed Knott with Major Depressive Disorder, recurrent, severe with psychotic features.  Dr. Martinez discontinued the Librium and prescribed  Risperdal 4 mg ½ tablet twice a day.  Dr. Martinez directed Knott to continue taking Prozac and return in two weeks.

On July 18, 2002, Knott's case management team at Mental Health Resources, Inc. completed an Annual Clinical Assessment Update Form.  Tr. 212-217.  The team rated Knott's overall level of therapeutic gain as "slight."  Tr. 212.  The team also rated Knott's level of cooperation with the treatment team as slight, her level of motivation in treatment as slight, and her gains in functional status as slight.  The team completed a Mental Status evaluation and noted the following: (1) her appearance was appropriate; (2) her posture was normal; (3) her facial expressions were unremarkable; (4) her general body movements were fidgety; (5) her speech was soft; (6) her comfort style was compliant; (7) her affect/mood was appropriate; (8) her communication was coherent; and (9) her perception was normal.  The team further found Knott had  no intellectual functioning impairments, was oriented in all four spheres, her recent memory and her judgment were impaired, her thought content was appropriate, and her thought process

16

was flexible.  Significantly, the team rated the severity of impairment in nine domains and found

Knott was severely impaired in the interpersonal domain, moderately impaired in the psychiatric

domain and moderately impaired in the community support systems domain.  The team, however,

found Knott was not disabled in the medical or mental health domains.  The team noted Knott

reported symptoms of worthlessness, decreased energy and motivation, uncontrollable crying

spells, restlessness, muscle tension, sleep disturbance, and inability to control worry.

The team included an "Addendum to Assessment" which stated, in part:

The following needs were identified (better housing and part time employment) and a
referral was made to case management for help with ADLs, links to housing (when she
separates from husband– planned) employment evaluation and intervention.
Diagnosis: Major Depressive Disorder, recurrent, with psychotic features
Patient presented with the following symptoms which start[ed] sixteen years ago and have
persisted until to (sic) present.

Thoughts of harm to self or others 3 times per week
Anxious mood most of the day everyday
Diminished interest or pleasure in activities most of the day everyday
Diminished ability to concentrate nearly everyday
Feelings of worthlessness everyday

Interventions include individual counseling, psychiatric medication evaluation, employment
assistance, and case management.  Additional interventions include possible psi group
referral to improve communication and improve support group.  Also crisis plan is in place
and ct understands options should thoughts of harm to self return.
Estimated length of treatment is indefinite.
Expected outcome of treatment is long term and continued need for future services.
Discharge date– indefinite
Prognosis is poor

Tr. 215.

On July 24, 2002, Knott returned for her follow-up with Dr. Martinez.  Tr. 221.  Knott

reported "no depressive symptoms anymore."  *Id.*  Knott reported she spent the day cleaning her

house and watching television.  Dr. Martinez noted Knott was friendly, mood was good, affect

was lively, she was oriented, and she had no hallucinations.  Dr. Martinez diagnosed Knott with

17

Major Depressive Disorder, in remission.  Dr. Martinez directed Knott to continue taking the Risperdal and Prozac and return in six weeks.

On August 28, 2002, Knott returned for her follow-up with Dr. Martinez.  Tr. 219.  Knott reported she had not taken her medications for the previous two days because she did not know she had a refill.  However, Knott had not developed depressive symptoms.  Dr. Martinez noted Knott's mood was OK, her affect irritable, oriented OK, and possible paranoid ideation.  Dr. Martinez advised Knott to continue taking Risperdal and Prozac.

On September 29, 2002, Knott returned to see Dr. Martinez.  Tr. 218.  Knott reported she had fallen in her bath tub and saw "stars" afterwards.  Knott reported she continued to see stars for a few minutes daily since she fell.  Dr. Martinez noted Knott was walking with difficulty, her mood was OK, her aspect was restricted, and had "vision hallucination of stars."  *Id.*  Dr. Martinez diagnosed Knott with (1) Major Depressive Disorder, recurrent, in remission and (2) Rule out Epilepsy.  Dr. Martinez directed Knott to continue taking her medications and return in one month.

On November 12, 2002, Dr. Martinez ordered an EKG to rule out postural hypotension. Tr. 225.  Dr. Martinez noted Knott had Major Depressive Disorder, recurrent, in remission.

On January 6, 2003, Dr. Chestnut submitted a "To Whom It May Concern" letter.  Tr. 253.  Dr. Chestnut noted he had not seen Knott since July 2002.  Dr. Chestnut stated Knott had complained of back pain but, due to finances, she had been unable to follow his recommendations that she be evaluated at a pain management clinic and also seek help at the New Mexico Spine Institute.  Dr. Chestnut opined Knott's fractures in her back would cause her back pain.  Dr. Chestnut opined Knott had physical disabilities and needed further evaluation "both in a clinic and

by MRI examination." *Id.*  Dr. Chestnut requested Knott be given assistance so that she could be evaluated.

**1.  Evidence Presented to the Appeals Council**

On January 14, 2003, Knott returned to see Dr. Martinez.  Tr. 14.  Knott complained of lack of pleasure, insomnia, and fatigue.  However, Dr. Martinez noted Knott admitted to taking her medications only "about 3 or 4 days a week." *Id.*  Dr. Martinez described Knott's mood as fair, her affect labile, and oriented in all spheres.  Knott reported having auditory hallucinations.  Dr. Martinez diagnosed Knott with Major Depressive Disorder, recurrent in partial remission and poor compliance with medication treatment.

On February 11, 2003, Knott returned for her follow-up with Dr. Martinez.  Tr. 13.  Knott reported she was taking her medications "more often than not." *Id.*  Dr. Martinez noted Knott's mood was OK, her affect was lively, she was oriented, and she was no longer having hallucinations.  Dr. Martinez diagnosed Knott with (1) Major Depressive Disorder in partial remission and (2) non-compliance with medication treatment.

On March 3, 2003, Dr. Chestnut ordered an MRI of the lumbar spine.  Tr. 10.  The MRI indicated the following:

> FINDINGS:
> There is a disk bulge at L4-5 and a second disk herniation at L5-S1.  The disk bulge at L4-5 is minimal in extent.  The disk bulge at L5-S1 appears to be significant.  There is disk desiccation at L4-5 and at L5-S1.  The vertebral body heights are normal throughout.  No inflammatory or malignant changes are evident.  No acute fracture or subluxation is defined.  Hypertrophy of ligamentum flavum is present at L4-5 and at L5-S1.  Spinal stenosis is present at L4-5 and L5-S1.  There is a gibbous deformity at T11-T12 with degenerative disk herniation at this same level.  This radiographically significant.  Clinical correlation would be helpful to assess the clinical significance.
>
> IMPRESSION:

      1.  Degenerative disk disease L4-5 and L5-S1 with hypertrophic facet disease and
hypertrophy of ligamentum flavum producing spinal stenosis at these levels.
      2.  Degenerative disk disease T11-T12 with narrowing of this disk space and gibbous
deformity of the spine.

Tr. 10.

      On March 11, 2003, Knott returned for her follow-up with Dr. Martinez.  Tr. 12.  Dr.

Martinez noted, "Pt. continues failing to take her medications regularly because 'she didn't have a

ride' to the pharmacy even though she gets free meds from PAP and meds samples."  *Id.*  Dr.

Martinez noted Knott was angry, her mood was OK, her affect was irritable, she was oriented,

and she reported no hallucinations.  Dr. Martinez diagnosed Knott with (1) Non-compliance with

medication treatment; and (2) Major Depressive Disorder, recurrent.  Dr. Martinez directed Knott

to continue taking her medication and return in two months.

**B.  Dr. Trance's Evaluation**

Knott contends the ALJ erred when he failed to give a reason for rejecting Dr. Trance's opinion that she could not perform prolonged standing and walking.  Knott further contends the ALJ erred when he failed to include in his hypothetical question to the VE that she could not perform prolonged standing and walking.  The record does not support these contentions.  Citing to Dr. Trance's Consultative Evaluation, the ALJ noted in his decision:

> A consultative physical examination was performed on September 8, 2001.  Physical examination showed tenderness to palpation over the left hip with decreased range of motion of the left hip.  The doctor diagnosed chronic left hip pain, post traumatic stress disorder, history of domestic abuse and physical abuse, urinary incontinence and constipation.  He stated that the claimant cannot lift over 20 pounds frequently and cannot stand, walk or sit for prolonged periods of time.  However, he felt that the claimant would have no limitations in overhead reaching, handling of objects or fine manipulations.  Such limitations are consistent with ability to perform light work activity (Exhibit 3F/4).

Tr. 21-22.  Relying on Dr. Trance's consultative evaluation, the ALJ found Knott was capable of performing a limited range of light work.  This finding is supported by Dr. Trance's evaluation.  Dr. Trance completed a Medical Source Statement of Ability To Do Work-Related Activities and opined Knott was (1) limited in her ability to lift and carry, noting she could lift 50 pounds occasionally and 20 pounds frequently; (2) limited in her ability to stand and/or walk, noting **she could stand or walk up to 6 hours in an 8-hour workday**; and (3) limited in her ability to sit, noting **she could sit up to 2 hours in an 8-hour workday**. Tr. 114-115.  These limitations are consistent with an RFC for light work activity.  Thus, although Dr. Trance found that prolonged standing and walking may be limited, nonetheless, Dr. Trance opined Knott could stand and/or walk up to 6 hours in an 8-hour workday.  The ALJ included these limitations in his hypothetical to the VE.  Tr. 294.

**C.  Knott's Mental Impairment**

Knott argues the ALJ did not consider the impact of her mental impairment on her ability to function, did not assess the impact of her mental impairment on her ability to function full-time in the workplace, and failed to address the treating counselor's comments regarding her inability to work and the low GAF score the counselor assigned to her.

Relying on Dr. Johnson's January 10, 2002 consultative psychiatric evaluation and Dr. Blacharsh's May 18, 2002 Mental RFC Assessment, the ALJ addressed Knott's anxiety and depression noting:

> Regarding the claimant's anxiety and depression, a consultative psychiatric evaluation was performed on January 10, 2002.  On mental status examination, the claimant was oriented to person, place and time.  Mood was depressed and affect tearful.  The claimant was cooperative and maintained adequate eye contact.  Socialization skills were acceptable.  Thought processes were slow but intact.  There was no looseness of associations.  There were no symptoms of overt psychoses or neuroses.  The doctor diagnosed a prior history of major depressive disorder and post traumatic stress disorder.  GAF was estimated to be 55 which indicates moderate psychiatric symptoms (DSM-IV and Exhibit 5F).

> Accordingly, I find the claimant retains the residual functional capacity to perform a limited range of light work.  She has some additional nonexertional limitations associated with her anxiety and depression.  She is limited to simple, non-public, non-demanding work that requires only one or two step tasks.

Tr. 22.  Based on Dr. Blacharsh's Mental RFC Assessment (Tr. 175), the ALJ found Knott was limited to simple, non-public, non-demanding work that required only one or two step tasks.  Dr. Blacharsh relied on Dr. Martinez' clinical notes but did not refer to Knott's quarterly and annual reviews and concluded Knott was capable of simple repetitive 1-2 step tasks with adequate pace and persistence and with limited social contact.  Tr. 175.   In preparing the Mental RFC Assessment, Dr. Blacharsh noted:

> According to treating physician (TP), with MDI of adjustment disorder with depression and anxiety and PTSD.  History of physical and sexual abuse in marriages, maybe in childhood.  One prior suicide attempt 3 years ago.  No inpatient treatment.  Outpatient treatment includes both medication (Librium) and psychotherapy.  As of 3/28/02 appointment with TP, with complaints of irritability, poor concentration and motor

22

tension; mental status exam significant for being 'cheerful,' in "good mood" and 'lively affect,' non-psychotic and oriented.

With moderate impairments in ADL's, social functioning and concentration, persistence and pace. Needs help with household chores, transportation, shopping, bill paying and decision making. Problems interacting with family and neighbors but relates to husband, friend and therapist. Pain affects concentration; 'sometimes' has problems with following instructions and completing tasks. Information insufficient to assess episodes of decompensation.

Without marked impairment in any of the skills needed for unskilled work.

Drugs and alcohol non-issues.

In sum, 40 year old woman with MDI's of adjustment disorder and PTSD who has severe limitations that do not meet or equal any of the listings. Should be able to do simple repetitive 1-2 step tasks with adequate pace and persistence; may do better with limited social contact. Referral to DVR may be helpful.

Claimant partly credible. When supported by evidence weight given to TP rather than CE (primarily in diagnosis); otherwise MER consistent.

Tr. 175. Thus, the ALJ considered the impact of Knott's mental impairment on her ability to function and assessed the impact of her mental impairment on her ability to function full-time in the workplace. However, the ALJ adopted Dr. Johnson's findings but failed to address Knott's case management team's findings regarding her inability to work due to her mental impairments.

Knott also argues that the ALJ failed to address her treating counselor's comments regarding her inability to work and the low GAF score the counselor assigned to her. The record indicates that on July 10, 2001, a clinician opined Knott was not capable of holding a job "at the present time." Tr. 167(emphasis added). The clinician recommended Knott have a medical evaluation with a psychiatrist for medication management. *Id.* On July 31, 2001, Dr. Martinez evaluated Knott and prescribed medication. Tr. 159-160. The evidence indicates Knott's mental impairment improved on medication.

23

However, on October 10, 2001, Knott's case management team opined Knott was impaired in her ability to obtain or maintain a job.  Tr. 155 (Quarterly Treatment Plan Update). Dr. Martinez signed the treatment plan update indicating his concurrence with this opinion.  On January 2, 2002, the team again opined Knott's symptoms impaired her ability to work.  Tr. 152 (Quarterly Treatment Plan Update).  Dr. Martinez also concurred with this opinion.  On July 18, 2002, Knott's case management team assessed her progress and noted her overall level of therapeutic gain was <u>slight</u>, her gains in functional status as <u>slight</u>, and her level of motivation in treatment as <u>slight</u>.  Tr. 212.  Significantly, the team opined Knott "[could] not work due to medical problems– back, hip, legs, and mental issues."  Tr. 214.  The team noted Knott "currently presented with depressive issues and suicidal thoughts almost every day."  *Id.*  The team considered Knott's medication treatment and noted, "Dr. Martinez has adjusted her meds to a point at which she can maintain a less painful, reduced delusions, reduced suicidal thoughts, and less depression."  *Id.*  Knott also reported her medication treatment was having "a positive affect (sic)."  *Id.*  Dr. Martinez concurred with these findings and signed the assessment form.

By July 24, 2002, Knott reported "no depressive symptoms anymore."  Tr. 221.  Dr. Martinez noted Knott was friendly, her mood was good, her affect was lively, she was oriented and she had no hallucinations.  Dr. Martinez found her Major Depressive Disorder in remission. And, although Knott did not take her medications as prescribed, on August 28, 2002, Knott had not developed depressive symptoms.  On November 12, 2002, Dr. Martinez noted Knott's Major Depressive Disorder was in remission.  However, by January 14, 2003, Knott was again experiencing depressive symptoms.  At this time, Knott admitted she only took her medications "about 3 or 4 days a week."  Tr.  14.  Dr. Martinez noted Knott's Major Depressive Disorder was

24

in partial remission and her compliance with the medication treatment was poor. On February 11, 2003, Knott reported she took her medication "more often than not." Tr. 13. Dr. Martinez found her mental impairment in partial remission and noted her non-compliance with medication treatment. On March 11, 2003, Dr. Martinez again noted Knott's non-compliance with her medication treatment. Tr. 12.

The Commissioner argues "[t]he medical records show that Plaintiff's mental impairment was generally controlled with medication and counseling despite her non-compliance with her medication regimen." Def.'s Resp. at 5. The record does not support this statement. When Knott took her medications as Dr. Martinez prescribed, her depressive symptoms and hallucinations decreased and at one point ceased. Unfortunately, Knott was not compliant with her medication treatment. Off her medications, Knott experienced depressive and psychotic symptoms.

The ALJ relied on Dr. Johnson's consultative evaluation to find Knott could perform a limited range of light work and was limited to simple, non-public, non-demanding work requiring only one or two step tasks. Tr. 22. However, Dr. Martinez' clinical notes and the case management team's quarterly and annual assessment reviews do not support this finding. Unless good cause is shown to the contrary, the Commissioner must give substantial weight to the testimony of the claimant's treating physician. If the opinion of the claimant's physician is to be disregarded, specific legitimate reasons for this action must be set forth. *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984). As Knott's treating physician, Dr. Martinez' opinion was entitled to substantial weight.

Additionally, failure to follow a prescribed course of treatment, without good reason, is grounds for denial of disability benefits, 20 C.F.R. 404.1530(b), and can be the basis for discrediting claimant's subjective complaints. *See Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774, 777 (10th Cir. 1990). The Tenth Circuit has set out four requirements that must be met before a claimant's failure to undertake treatment will preclude the recovery of disability benefits: "(1) the treatment at issue should be expected to restore the claimant's ability to work; (2) the treatment must have been prescribed; (3) the treatment must have been refused; (4) the refusal must have been without justifiable excuse." *Teter v. Heckler*, 775 F.2d 1104, 1107 (10th Cir. 1985). The Court will remand this case to allow the ALJ to consider Dr. Martinez' opinion that Knott was not able to work due to her mental impairments. The ALJ should request Dr. Martinez complete a Mental Residual Functional Assessment form. The ALJ should also inquire from Dr. Martinez whether Knott would be able to work if she took her medication as prescribed. In order for the ALJ to deny benefits for failure to follow a prescribed course of treatment, the ALJ must apply the four requirements set forth in *Teter.*

Finally, although Knott did not raise the issue of the March 1, 2003 MRI in her brief in support of her motion, on remand, the ALJ should consult with Dr. Chestnut regarding the implications of those results. According to the MRI, Knott has a significant disk bulge at L5-S1 and degenerative disk disease at L4-5 and L5-S1 with hypertrophic facet disease. Tr. 10. The ALJ did not have the opportunity to consider this evidence because it was not before him at the time of the administrative hearing. However, because Knott's May 6, 2001 x-rays of the lumbar spine indicated only minimal changes of the lumbar spine, her December 7, 2001 x-rays of the lumbar spine indicated a normal lumbosacral spine, and her January 14, 2002 x-rays of the lumbar

spine indicated "no abnormalities seen in the lumbar spine," the ALJ also should determine whether this is a recent development and outside her insured status.  According to the record, Knott was insured for disability benefits through September 30, 2002, and she must establish disability on or prior to this date.  Tr. 20.

Because on remand Knott will have the opportunity to challenge the VE's testimony regarding a conflict between her testimony and the DOT, the Court will not address this issue. However, the Court notes the VE's testimony that the jobs of housekeeper (DOT No. 323.687-010) and spray machine operator (DOT No. 599.685-074) were light and unskilled is contrary to the DOT which lists these jobs as medium work.  Tr. 293.

A judgment in accordance with this Memorandum Opinion and Order will be entered.


_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**


27